# IN THE UNITED STATES DISTRICT COURT
# FOR THE WESTERN DISTRICT OF WISCONSIN

NANCY KNUDTSON,

        Plaintiff,

v.

COUNTY OF TREMPEALEAU and
TAAVI MCMAHON,

        Defendant.

OPINION AND ORDER

18-cv-354-wmc

In an unfortunate series of events reflecting poorly on all concerned, defendants placed plaintiff Nancy Knudtson on administrative leave and eventually terminated from her job as a paralegal/office manager with the Trempealeau County's DA office after she refused to attend a funeral for a district attorney from a neighboring county. In this lawsuit, Knudtson claims that defendants' actions violated her rights under the Establishment Clause of the First Amendment to the United States Constitution. Before the court are defendants' motions for summary judgment. (Dkt. ##24, 29.) For the reasons that follow, the court concludes both that the undisputed facts foreclose an Establishment Clause claim and, were this not so, no reasonable jury could find in plaintiff's favor. Accordingly, the court will grant both defendants' motions for summary judgment and direct entry of judgment in their favor.

# UNDISPUTED FACTS[1]

### A. Background

Defendants Trempealeau County and its District Attorney, Taavi McMahon, terminated plaintiff Nancy Knudtson's employment on March 9, 2018. Having worked for the County for some 47 years at that point, Knudtson worked most recently (from 1990 until the date of her termination) in the Trempealeau County District Attorney's office as a paralegal/office manager.

The County of Trempealeau is organized under Chapter 59 of the Wisconsin Statutes and located north of La Crosse and west of Jackson Counties, abutting the Mississippi River. It has a county board of supervisors and at least three sub committees, including the Executive/Finance Committee, the Personnel/Bargaining Committee, and the Law Enforcement/Emergency Management Committee. Defendant Taavi McMahon was the Trempealeau County District Attorney from October 2012 to November 2018. McMahon was an elected official.

The DA's office, the Trempealeau County Circuit Court and the Human Resources Department are all housed in the municipal building in Trempealeau, Wisconsin, with the HR office located about 30 feet down the hall from the DA's office. Amy Spriggle is the Director of Human Resources for Trempealeau County. She has held that position since June 2017 and reports to the Personnel/Bargaining Committee. Becca Zaccaria is employed by the County as a Human Resources Generalist and reports to Spriggle. Rick

---

[1] Based on the parties' submissions at summary judgment, the court finds the following facts material and undisputed, unless otherwise noted.

Niemeier is the County's Corporation Counsel. He has held this position since July 2017 and reports to the Executive/Finance Committee. John Sacia is the current Trempealeau County District Attorney, and he was the Assistant District Attorney from 2015 to 2018. Robin Leonard is the Victim/Witness Coordinator, working for the District Attorney and employed by the County. She has held that position for five years. Carol Betthauser is currently employed by the County as a paralegal in the district attorney's office, and has been in this position since May 2018. Before that, she had been a legal assistant in the DA's office since 2000.

During Knudtson's time working in the DA's office, the DA gave her work instructions. Knudtson never received assignments or directives from anybody at the County. Both she and her DA colleagues, Leonard and Betthauser, physically worked in the DA's suite. However, as a County employee, Knudtson was required to follow County procedures, rules and regulations adopted by the County Board.

### B. Colleague's Death and DA's Plan to Close the Office for September 7, 2017, Funeral

On Monday, September 4, 2017, Jackson County District Attorney George Fox passed away unexpectedly at the age of 56. Before Fox became the DA, he was a public defender who saw the Trempealeau County DA's staff on a daily basis; even after Fox became the Jackson County DA, the two county offices would work together on cases approximately three or four times per year. His funeral was scheduled to be held on Friday, September 8, 2017, at the Black River Falls Methodist Church.

Defendant McMahon had also known Fox since about 2005 and considered him both a friend and mentor. Accordingly, on Thursday, September 7, 2017, he sent the following email to the Trempealeau County DA staff, including Knudtson:

> I know that some of you will want to attend the funeral/and or visitation. I am approving this for everyone. I don't want you to worry about hours, we will work it out.
>
> Out of respect for DA Fox I am going to close our office tomorrow starting at 10:00 am for the rest of the day. I will be available via my work cel[l . . .] for emergency law enforcement.
>
> It is my preference that we all go to pay our respects but I will not require attendance, I will only encourage it.
>
> I will advise the appropriate parties[.]

(McMahon's PFOFs (dkt. #52) ¶ 22.)

A couple of hours later, Knudtson responded:

> I have spoken to staff and they plan on working tomorrow. Robin will be going to the wake tonight and I am trying to cancel my appointment and so I can be there too. We are required to use our vacation in order to attend according to HR's handbook. Carol indicated that she does not want to use her vacation and has very little. Robin indicated [] if you require someone from the office to attend, she will take vacation.
>
> I have already arranged to meet with JJ to compile a criminal complaint for you on the two defendants. I wasn't aware that you wanted me to do the criminal complaint on them and it has been difficult to get this done with his schedule. Tomorrow will work fine w/no distractions.

(*Id.* ¶ 23.)

As described in that email, neither Knudtson nor Leonard and Betthauser wanted to attend Fox's funeral, although Leonard and Knudtson planned to attend his wake that

4

evening. All three also preferred to work the following day. In particular, Knudtson had also planned to meet with a DNR warden on Friday, September 8, from 1:00 p.m. until 4:30 p.m. to work on a criminal complaint, which required her to access a software program used by DA offices statewide. At her deposition, Knudtson testified that she made the decision not to attend the funeral before she knew the nature or the type of service that was going to be held or that it was going to be a religious service. (Knudtson Dep. (dkt. #19) 36-37.)

Also on September 7, Knudtson spoke with Becca Zaccaria in the HR Department about McMahon's plan to close the DA's office for the funeral and request that staff attend the funeral. Zaccaria agreed to pass along her questions to HR Director Spriggle. Later that day, Spriggle went to the DA's office and told the staff that McMahon could not force the staff to attend the funeral; he could not close the office; and she would speak with Corporation Counsel Neimeier about both issues. Later that day, Spriggle also informed Knudtson that if employees were to attend the funeral, they would have to take vacation time to do so.

Corporation Counsel Niemeier spoke with DA McMahon by telephone that day, informing him that he needed to leave the office open to allow his staff to work. McMahon responded that he was going to close the office anyway, because he felt that was the right thing to do. In a follow-up email still on November 7, Niemeier also advised McMahon

that if any employees attended Fox's funeral, they would be required to use a vacation day.² Even so, McMahon did not think it was fair.

### C. Events of September 8, 2017

Knudtson arrived in the office around 7:00 a.m. on Friday, September 8, 2017. McMahon called Knudtson that morning on his way into the office and asked her to gather staff in the back room. He arrived around 9:00 a.m., planning to depart for the funeral by 9:30 or 9:45, and met with Knudtson, Betthauser and Leonard to inform them that he still intended to close the office.

At that meeting, Betthauser and Knudtson again indicated that they wanted to work, while Leonard agreed to attend the funeral. At that time, Knudtson testified that McMahon became angry, was red in the face, yelling and screaming. However, both Betthauser and Leonard, testified that he was not yelling or screaming.

Regardless, there is no dispute that McMahon first responded to Betthauser during the meeting, indicating that her options were to go to the funeral or work from home. Betthauser responded that she did not know how to use a laptop and was not going to work from home. Betthauser also stated that she did not want to use a vacation day because she only had three left and wanted to save them. McMahon then offered to pay her a vacation day out of his own pocket. At some point, Betthauser began to cry. Eventually, Betthauser told McMahon, "I will go to the fucking funeral." (Pl.'s PFOFs (dkt. #43) ¶ 49 (quoting Betthauser Dep. (dkt. #17) 14)).) Betthauser testified at her

---

² The County's employee handbook provides "If time is needed for deaths of others [than the listed family members], the employee may request supervisor approval to use personal holiday or vacation time." (County's PFOFs (dkt. #26) ¶ 15.)

6

deposition that she did not feel that there would be "negative repercussions" if she refused to go, but that she did feel pressure to go. (Betthauser Dep. (dkt. #17) 18.)

During this exchange between McMahon and Betthauser, Knudtson left the office to retrieve HR Director Spriggle. Upon their return, McMahon gave Knudtson three options: (1) go to the funeral; (2) work from home; or (3) take a leave or be suspended. Spriggle responded that he could not place McMahon on leave. She also advised McMahon that the County did not have a work-from-home policy. Defendants do not dispute the lack of such a policy, but now point out that Knudtson had the capability to work remotely using a laptop computer and the County did not have a policy *prohibiting* working remotely. At that point, Knudtson testified that McMahon responded, "Nobody's going to fucking tell me how to run my office." (Pl.'s PFOFs (dkt. #43) ¶ 59.) Spriggle does not recall McMahon using profanity, but does not dispute the substance of his response. (McMahon's Resp. to Pl.'s PFOFs (dkt. #53) ¶ 59.) Moreover, there is no dispute that the exchange had become heated by that point, prompting Spriggle to suggest that Knudtson leave the office and take a walk in an effort to de-escalate the situation.

While Spriggle was still in the D.A.'s office, McMahon called the maintenance department to change the lock on the main office door. McMahon testified at his deposition that one of the reasons he changed the locks was that he did not want Knudtson entering the office after he went to the funeral. McMahon also called the State's IT department in Madison to request that the State freeze Knudtson's computer account, which it did. McMahon then closed the office, placing a sign on the office door indicating that the office was closed for Fox's funeral.

After walking around the building, Knudtson returned to the HR department to speak with Spriggle and Corporation Counsel Niemeier. Knudtson again advised that she was not willing to go to the funeral and that she was not able to work from home as she had set up a meeting in her office that afternoon to work on a criminal complaint. While Spriggle and Niemeier asked her several times if she would be willing to consider going to the funeral, Spriggle also reassured Knudtson that she had done nothing wrong. Niemeier and Spriggle eventually advised Knudtson that her only option was to be placed on paid administrative leave. Knudtson was assured that she still had a job and that they would try to resolve the matter on Monday. Spriggle further advised Knudtson not to come back to work until things were worked out with McMahon and to not have contact with him during this time. As plaintiff points out, there is no indication that Spriggle or Niemeier ever considered offering Knudtson a desk in the HR department or another County office space.

### D. Knudtson's Placement on Administrative Leave and Efforts to Return Her to Work

On either Monday, September 11, or Tuesday, September 12, Spriggle informed McMahon that Knudtson was home on paid administrative leave and would remain on leave until things could be worked out. Either on the 12th or 13th, Spriggle and Neimeier met with McMahon in Spriggle's office to discuss what happened on September 8. As Corporation Counsel, Niemeier specifically asked what it would take for Knudtson to come back and what would happen if she returned. McMahon responded that he would have a conversation with her and would remove her office manager duties. Based on their overall

8

exchange during that conversation, Spriggle believed that this issue was not going to be easily resolved.

After the meeting, Spriggle called Knudtson to inform her that things were progressing slowly and reassure her that she had done nothing wrong. Spriggle also advised that she was behind her 100%. Knudtson informed Spriggle that she wanted to return to work but did not want to work for McMahon, expressing concern that the work environment would be hostile and also mentioning that McMahon had a loaded gun. While Knudtson voiced some concern about McMahon having a gun at the office, it is also undisputed that he never threatened Knudtson or anyone else with a gun.

On September 18, McMahon left a voicemail for Knudtson at her home phone. She did not respond since she had been instructed by Niemeier and Spriggle not to have contact with McMahon. Knudtson informed HR Generalist Zaccaria that she had received a message from him. That day, Spriggle also worked to arrange a meeting with Knudtson, McMahon, and Neimeier to discuss Knudtson's return to work. On September 20, Knudtson, Spriggle, Neimeier, County Board Chairman Dick Miller, and Chairman of the Executive/Finance Department Dick Frey met to discuss Knudtson's return. McMahon did not attend the meeting, though there is a reference by Spriggle to him not attending the meeting because he was in the hospital for chest pains.

Instead, on September 27, 2017, McMahon sent a letter to Spriggle, stating:

> Please note that Nancy Knudtson has abandoned her job in my office. Since she left the office on September 7th, 2017 at approximately 9:30 a.m., I have not heard from her. I expected her to be back in the office to meet with me on Monday the 11th of September and she did not call or come to the office. You informed me that you told her to remain absent from work that week.

9

> On Monday the 18th of September, I called Nancy's home phone number and left her a message on her machine asking her to call me. As of today, I have not heard from her.
>
> As you are aware, Nancy's employment with the county is 'at-will' and the fact that she has made no effort to communicate with me or come to work for 13 work days is more than enough evidence that she has decided to leave her employment with our office.
>
> My office cannot afford to be under-staffed especially in light of our increased work load given the assistance we are providing to Jackson County. I will need to make arrangements to fill her position immediately.

(Pl.'s PFOFs (dkt. #43) ¶ 103.)

After receipt of the letter, both Spriggle and Neimeier informed McMahon that Knudtson had not abandoned her job, but had been placed on administrative leave. Despite this, McMahon believed that Knudtson was insubordinate and had abandoned her job. At that point, McMahon was no longer interested in discussing Knudtson's return to work and refused to attend meetings Spriggle attempted to schedule with him.[3]

On November 22, 2017, the Executive/Finance Committee and the Personnel/Bargaining Committee sent McMahon a letter indicating that (1) Knudtson "must be returned to her position in the same capacity as she had prior to her suspension," (2) McMahon must apologize to Knudtson in writing by November 29, 2017, and (3) McMahon must apologize to Spriggle for his abusive and inappropriate comments. On

---

[3] At one point the County Executive/Finance Committee even wrote to then Governor Scott Walker to ask for his assistance and guidance in attempting to resolve the issue between Knudtson and McMahon.

December 4, McMahon responded in writing that Knudtson had abandoned her position and her return to the office was not feasible or appropriate.

Between September 2017 and March 2018, Knudtson remained on paid administrative leave. She had conversations with Spriggle during this period, during which Knudtson expressed that she was ready to return to work, but also reported that she was no longer willing to work for McMahon. Instead, she expressed an interest in working under the direction of the assistant district attorney or a County committee.

### E. County's Efforts to Create New Position

On January 4, 2018, Spriggle contacted Knudtson, indicating that the Executive/Finance Committee wanted to meet with her to discuss a return to work. On January 18, 2018, Knudtson attended a closed joint session of the members of the Executive/Finance Committee and the Personnel/Bargaining Committee. During that session, the members discussed creating a new position for Knudtson where she would no longer report to the DA.[4] Instead, she would work on children in need of protective services ("CHIPS") and termination of parental rights ("TPR") cases, and on HR clerical work. That position would provide for the same pay and benefits as her previous job in the DA's office, although plaintiff points out that (1) there was no specific job description for the position and (2) creating a new county position would require various forms and approvals, including approval to transfer the CHIPS portion of the job from the DA's office to the Corporation Counsel's office. On January 19, 2018, Knudtson declined this job on the

---

[4] Between September 2017 and January 2018, there were a number of meetings by County committees discussing employee related matters in the DA's office, which are detailed in McMahon's proposed findings of facts, but not pertinent to the motion before this court.

basis that the duties were not sufficiently defined. Subsequently, Knudtson also refused to meet with Spriggle and Niemeier to discuss her return to work.

### F. Knudtson's Termination

On February 13, 2018, Niemeier sent Knudtson a letter advising that her current employment would be terminating, effective March 9, 2018:

> The Executive/Finance Committee and the Personnel/Bargaining Committee met to discuss the status of your employment. As you are aware, you were placed on paid administrative leave after an incident in the District Attorney's Office in September 2017. Since that time, Trempealeau County has attempted numerous times to resolve your employment situation in the District Attorney's Office. The County attempted to return you to your position in the District Attorney's Office, however, for a number of reasons, this has not been possible. The County also offered to create a new position with the County in an attempt to allow you to continue your employment with Trempealeau County. After a discussion with Ms. Spriggle, you advised Ms. Spriggle that you were not interested in the proposed new position. Unfortunately, the County does not have an equivalent position available for you and, as stated above, you are unable to return to your previous position in the District Attorney's Office. As a result, the County is unable to continue to offer you employment with Trempealeau County.

(Pl.'s PFOFs (dkt. #43) ¶ 147.) In connection with the termination, the County also offered Knudtson a severance package valued at approximately $43,000.

## OPINION

In her complaint, plaintiff claims that defendants' actions violated (1) the Establishment Clause of the First Amendment; and (2) the Fair Labor Standards Act, 29 U.S.C. § 215(a)(3). In response to defendants' motion for summary judgment, plaintiff dropped her FLSA claim and, therefore, the only claim before the court sounds under the

Establishment Clause. Defendant Taavi McMahon is represented by the Wisconsin Department of Justice; the County is represented by its own counsel. Both have moved separately for summary judgment, in part arguing that the other party is responsible for any violation. The court need not resolve these finger-pointing arguments, however, because the undisputed facts establish that defendants' actions do not implicate the Establishment Clause.

Before turning to the law governing plaintiff's claim, the court will first identify the specific action or actions she claims violated the Establishment Clause. On the part of McMahon, plaintiff challenges his closing the DA's office for the funeral and applying significant pressure to attend the funeral. Of course, whether Knudtson opted to attend the funeral or not, McMahon's action in closing the office -- in combination with the County's refusal to accommodate her working remotely and ease the requirement that employees take vacation leave to attend funerals -- effectively forced Knudtson to take a paid day off. On the part of the County, Knudtson challenges its encouraging her to attend the funeral to make peace with McMahon, placing her on paid administrative leave because of her refusal to attend the funeral (coupled with McMahon's decision to close the office and the County's view that she could not work remotely), and ultimately terminating her employment.

The Establishment Clause of the First Amendment prohibits Congress from enacting any law "respecting an establishment of the First Amendment." U.S. Const. amend. 1, cl. 1. The Supreme Court has found these protections extend to actions of states and municipalities under the Fourteenth Amendment. *See Everson v. Bd. of Educ. of Ewing Twp.*, 330 U.S. 1, 8 (1947). The Supreme Court has developed a number of tests to

determine whether government action implicates the Establishment Clause "through impermissible endorsement of a religious view, through coercion, or through a religious purpose." *Mayle v. United States*, 891 F.3d 680, 684 (7th Cir. 2018). As the Seventh Circuit recently explained, these tests are required because "before we can find that something runs afoul of the Establishment Clause, we must do more than spot a religious component of a challenged activity, no matter how inconsequential." *Id.* These tests also assist in looking at the "totality of circumstances surrounding the challenged conduct from the perspective of a reasonable observer." *Id.* (quoting *Freedom From Religion Found., Inc. v. Concord Cmty. Sch.*, 885 F.3d 1038, 1045 (7th Cir. 2018)).

In her opposition to defendants' motions for summary judgment, plaintiff relies on two of these tests: coercion and primary effect. *First*, under the coercion test, the court must consider "whether the government has coerced the plaintiff to support or participate in religion." *Mayle*, 891 F.3d at 685 (citing *Town of Greece, N.Y. v. Galloway*, 572 U.S. 565, 586-87 (2018); *Lee v. Weisman*, 505 U.S. 577, 587 (1992)). The leading cases under this test concern school prayer. In *Lee v. Weisman*, 505 U.S 577 (1992), the Court held that a two-minute prayer at a middle school graduation violated the Establishment Clause because it placed "public pressure, as well as peer pressure, on attending students to stand as a group or, at least, maintain respectful silence during the invocation and benediction." *Id.* at 593. Similarly, in *Santa Fe Independent School District v. Doe*, 530 U.S. 290 (2000), the Court held that a student-initiated prayer before a high school football game "coerc[e]d those present to participate in an act of religious worship." *Id.* at 312.

Here, the record reflects that Knudtson was *not* required to attend the funeral and, therefore, was not a captive member of the audience; rather, McMahon repeatedly

provided her with three options: go to the funeral, work from home, or take a leave or be suspended. In fairness, the County, through Spriggle, determined that Knudtson could not work from home since the County had no policy permitting that arrangement, and also informed McMahon that he could not place her on leave, which the court infers would mean *unpaid* leave. Practically speaking, Knudtson's actual options in the end were to attend the funeral, which would require her to take a vacation day, or be placed on paid administrative leave by the County. On this record, no reasonable jury could find coercion to attend the funeral much less to support or participate in religion. Indeed, this conclusion is further supported by the undisputed fact that *at the time Knudtson decided not to attend the funeral*, she did not know that it would be a religious service.

As critically, Knudtson did not object on religious grounds, or otherwise notify defendants that she did not want to attend the funeral because of any religious overtones. To the contrary, it is hard to consider this record without concluding that the dispute between McMahon and Knudtson was a test of wills, rather than having anything to do with religious beliefs. Regardless, the court agrees with defendants that inherent in the coercion test is awareness on the part of the government of the plaintiff's objection to an activity based on religious grounds and the government's continued push for that activity. *See, e.g.*, *Norton v. Kootenai Cty.*, No. CV09-58-N-EJL, 2009 WL 2949324, at *7 (D. Idaho Sept. 11, 2009) ("Norton did not notify his probation officer of his religious-based objections to the requirement to attend AA meetings and he requested no alternative sober support unit although he could have done so. Therefore, Norton was not 'compelled' to attend AA meetings and his Establishment Clause rights were not violated.").

15

Finally, the record reflects that Knudtson's real concern was with McMahon's decision to close the office, thus disrupting her plan to work that day, and specifically her plan to complete a criminal complaint with a DNR warden. If anything, McMahon's frustration, however unreasonable, with Knudtson, the County's HR Director Spriggle, *and* Corporation Counsel Niemeier, all of whom pushed back on his authority to close the office, is palpable on this record. For this reason, plaintiff cannot argue -- and does not argue -- that the closing of the office was a religious activity. As such, even if defendants' actions constituted coercion, at most they were coercing her not to work that day, which in no way implicates the Establishment Clause.[5]

*Second*, plaintiff contends that defendants' actions had a primary effect of advancing or inhibiting religion. "Under *Lemon v. Kurtzman*, 403 U.S. 602 (1971), a practice is unconstitutional if it lacks a secular objective." *Freedom From Religion Found.*, 885 F.3d at 104 (citing *Lemon*, 403 U.S. at 612-13). The court "defer[s] to a government's statement of its aims, but the professed objective cannot be a sham or secondary to a religious goal." *Id.* (internal citations omitted). This argument fails to get off the ground.

Here, no reasonable jury could conclude that the principle effect of McMahon's urging of the DA office employees, including Knudtson, to attend Jackson County DA

---

[5] Even if McMahon could somehow be found to be coercing her attendance at the funeral itself, despite her religious objections, there would still be a question of qualified immunity under the current state of the law, especially in light of other cases where courts have rejected Establishment Clause claim involving participation in religious activities. *See Town of Greece*, 572 U.S. at 586-87 (rejecting argument that "through the act of offering a brief, solemn, and respectful prayer to open its monthly meetings, [the town] compelled its citizens to engage in a religious observance"); *Freedom From Religion Found., Inc. v. McCallum*, 214 F. Supp. 2d 905, 919 (W.D. Wis. 2002), *aff'd* 324 F.3d 880 (7th Cir. 2003) (rejecting Establishment Clause claim where "[o]ffenders under the custody of the Department of Corrections who are referred to Faith Works are informed of the program's religious content, told that they cannot be forced to participate, given a secular treatment option and allowed to participate in Faith Works only if they consent to its religious content").

Fox's funeral and to close the office because of his funeral was to advance religion. Rather, McMahon's decision had an indisputable secular purpose of paying respects to Fox and presumably his office, or at worst was motivated by hardheadedness or grief. *See Bridenbaugh v. O'Bannon*, 185 F.3d 796 (7th Cir. 1999) (closing office on Good Friday had a valid secular justification to provide a long spring weekend for employees at a time when most schools were also closed). The contemporary record demonstrates that this was his intent, and plaintiff offers *no* basis to challenge it. (McMahon's PFOFs (dkt. #52) ¶ 22 ("Out of respect for DA Fox I am going to close our office.").)

Moreover, as to the County, no reasonable jury could conclude that its decision to enforce the vacation day and teleworking policies was to advance religion. *See Sherman v. Cmty. Consol. Sch. Dist. 21*, 8 F.3d 1160, 1165 (7th Cir. 1993) (holding that Boy Scouts of America's involvement in school did not implicate the Establishment Clause where school applied a neutral facilities policy). Both facially and in practice, these were neutral policies that do not advance religion. Thus, the undisputed record reflects that the County had a secular reason for both enforcing these policies and encouraging her to attend the funeral.

No doubt, this string of events felt unfair to Knudtson, especially since she seems to have been caught in the middle of a complex dynamic not just in a standoff between McMahon and herself, but between McMahon and the County. Further, although it might be faulted for a lack of flexibility at the outset, the record reflects that the County repeatedly attempted to mend bridges and craft a role for Knudtson, which she expressly declined. Regardless of whether her reaction was reasonable, the defendants' initial actions of encouraging her to attend the funeral, closing the office and placing her on administrative leave do not implicate the Establishment Clause.

ORDER

IT IS ORDERED that:

1) Defendant County of Trempealeau's motion for summary judgment (dkt. #24) is GRANTED.

2) Defendant Taavi McMahon's motion for summary judgment (dkt. #29) is GRANTED.

3) The parties' amended stipulation regarding authentication of McMahon deposition exhibit 40 (dkt. #41) is ACCEPTED.

4) The clerk of court is directed to enter judgment in defendants' favor and close this case.

Entered this 10th day of October, 2019.

BY THE COURT:

/s/
_____
WILLIAM M. CONLEY
District Judge